Good morning. May it please the court. My name is Nils Rosenquist. I represent the plaintiff Helmut Skuja, and I'd like to reserve four minutes, I think, for rebuttal, please. What we are asking for in this case is a remand on the SSI disability application based on two fundamental grounds. One is that there is new material evidence of his residual functional capacity that he could not have introduced at the original hearing, and frankly, there were a number of defects at the original hearing, largely stemming from the fact that Mr. Skuja's spoken English, as opposed to his written English, is chancy at best. It was clear at the hearing that he had difficulties, and the key feature in this kind of SSI litigation is that, unlike most cases, he only gets one chance at this. Mr. Skuja came into the country under a grant of political asylum, and while most immigrants are not entitled to any benefits from the federal government, in the case of political asylum, you do have a one-time only opportunity to file for disability benefits. He entered where he had been a peace officer in Latvia. He had been shot. There is some question in the medical records, but he actually has two bullets, most of which are intact, sitting along his spine. Counsel, can I? Your time is ticking, and I promise we've read the briefs carefully. Okay. So can I go to your first point about the new evidence? Yes. Did any of the new evidence, I recognize he says that for economic reasons he couldn't afford to get the reports earlier, and that's his argument for good cause, but do those new records go to his condition as it existed at the time of the hearing? Yes, they do. I thought just the contrary. It seemed to me that your argument is now that the bullets fragments, bullets or bullet fragments have moved. No. There is evidence from Dr. Dvorkin that the bullets had moved at the time he had applied, and this simply confirms it, but the main issue is Dr. Ralph says, no, this is a retrospective report, looking at his condition at the time he filed in 2008. Most of the conditions that are discussed actually existed in 1999 when he was first shot, but Dr. Ralph specifically makes it clear that this is a retrospective report, which is permitted under the authorities. Now, I will say that it appears that there has been some small amount of migration of the bullets from when the 2004 reports were done, but he applies as of 2008, and so the position of the bullets in 2008 are largely unknown, and so the CAT scan in this case indicates that these relate to what they understood. They didn't know where the bullets were, counsel? He'd been through several. Yes, but as to where exactly the bullets were in 2008 versus the one medical report in 2006 and the one that was done for Dr. Ralph, my submission is that they are still roughly in the same place, but given the nature of these particular bullets, yes, they could have migrated slightly within the T10, T9 location. However, that would not be a factor. I have a procedural question. I understand that it is possible to introduce new evidence under the Social Security Act, but isn't that in the district court? Are you aware of any case in which there was an attempt to introduce new evidence for the first time after the final judgment in the district court? You did attempt to introduce it in the district court, but only after the final judgment in the district court. Is that right? Well, I would say Mr. Scuria did. I didn't come into this case until after that attempt. I understand that, but there was no attempt. The only attempt to introduce it was here in the appellate court. Do you have any case in which that's been permitted? I could give you the site. I did look it up. In fact, under the statute, the request for new evidence can be introduced at any time, including for the first time on appeal. That's a very unusual. There's no other instance in which that's true. In other words, evidence is something that you introduce in a district court. You don't introduce it in a court of appeals. That's true, but this particular Social Security statute specifically relating to SSI information gives the appellate court the power to accept new evidence and either take it in first instance or use that as a basis for remand all the way through. I understood that it gave the court the authority, but where does it say in the appellate court? Do you have a case that allowed it in an appellate court? In our original reply, we talk about the general standards. I don't believe there was a case specifically cited saying the first instance it ever came up was the court of appeal. Are you asking us to do that or are you asking us to remand? Remand. Okay. So if we were to do that, I think we still have another hurdle, which is if the bullet fragments haven't moved, how is it that we could say that there's a reasonable possibility that this new evidence would change the outcome? Because we'd have to be able to show that as well. Because the evidence that came in at the original hearing talked about some, but not all, the impairments that he is suffering. There is evidence from Dr. Ralph that there's nerve root compression, there's spondylosis. These were all conditions that preexisted his filing. And the problem is, is that because my client couldn't afford a comprehensive analysis, the medical evidence that he attempted to introduce was scattershot. But in all the medical evidence, going back even to 1999 and the surgeon's reports in Latvia, indicate you've got a spinal problem, you've got the bullets in these locations, the reasons we can't operate, there will be a problem in the future. And Dr. Ralph's report lays all of that out with modern lab results. So yes, we contend it would be operative to change the result. In addition, I would say that the administrative law judge relied upon the report by Dr. Eriks, who is the state examiner. She didn't actually look at any of this or go into it. She did a fairly perfunctory standard physical examination. He was not able to respond to her questions well. She disregarded it. And she concluded, interestingly enough, that she didn't find any substantial impairment, which was the one finding that the ALJ rejected when he issued his opinion. He said, no, she got that wrong. There is substantial impairment. Okay. So the report that he relies on, he can't fully trust. You just mentioned Dr. Ralph's report having the benefit of modern lab results. What results or methods did Dr. Ralph have that the earlier examiners did not? CAT scan. He did a full CAT scan. I don't believe there was a CAT scan any time previously. There were some X-rays. In Latvia, there were some X-rays, but this was the first full CAT scan. And it showed what? And it showed the presence of the the reports alternately referred to bullets and bullet fragments, but Show up on X-rays, counsel. So I'm trying to give you the benefit of the doubt. What is it that they got from the CAT scan that they didn't have earlier? I thought it was the location of the bullets or the fact that they had moved. Location of the bullets and the bone chips as well that are also present in the area. And you think those Because some of the fragments Counsel, counsel, my question is, is it your position that those wouldn't have showed up on earlier X-rays? Yes. At least not as clearly. Bones and bones and bullets? Bone fragments. Is there anything in the record that tells me that they were they were recognizing bone fragments in as that Dr. Ralph was able to do that earlier examiners could not? Dr. Prieto, I believe, refers to them to some extent in his report, but he was primarily concerned with an ankle and a shoulder. So that there was nothing done by any of the prior doctors that actually linked all these impairments together. And did, as I said, no one did an actual residual functional capacity analysis. This is the only actual assessment on his residual functional capacity. Not even Dr. Eriks did that. There are other things in the hearing that I think justify a remand. There was a tremendous body of information that Mr. Scuia tried to produce in writing because he didn't do it well verbally, but the record itself does not reflect a lot of reference to the things he produced in writing. In fact, mostly the administrative law judge relied on the hearing, which was a very short proceeding. Counsel, I didn't see anywhere in the record that your client's communication skills were indicated as lacking, and quite the contrary. The record, well, why don't... He speaks several languages. He's attended college courses in this country. He can write with the dictionary in his lap, but if you look at the actual transcript, the people who say his language are fine are checking a box. This is a form of tick-the-box litigation that takes place. Well, aren't there indications in the medical records from some of the medical providers that they didn't have any trouble communicating? I don't think there's anything in the records that indicated that they attempted that much to communicate, except Dr. Eriks' report. What's the best indication there was a problem communicating? I would say starting at the hearing transcript itself. Is there anything else? If we look at the transcript, for instance, he had difficulty even administering the oath. Counsel, anything other than the transcript is what I was trying to get at. I will go re-read the transcript, but is there anything else? The other things are, if you look at Mr. Scuia's written submissions... I have. They are a little opaque. Where he is going is difficult to translate. There is a wealth of information in there, but it is not readily apparent. There are concepts he doesn't quite get. His sentence structure is odd. This Court, frankly, was very indulgent in giving me extensions of time in which to file my brief because it was so hard to go through the record. And so if you look at his actual submissions, even his first motion for new evidence ran 65 pages, and it was not clear exactly what he was getting at. What he was trying to get at, however, is that he had tried to present, you know, new evidence that was material, but in 65 pages, single space, that was far from obvious. Wasn't there evidence that he did, in fact, after he came to this country, work full-time for several years? The evidence was muddled at best. In fact, the ALJ was starting to understand what the issue was at the hearing and then for some reason came back with a different result. The testimony from Mr. Scuria is the way he came to this country, he was assisted by two FBI agents, and that they had obtained employment for him as he entered, but the employment itself recognized his physical condition and so that he had special conditions attached to it. So he could take two-hour breaks and so forth. The ALJ actually recognized that at the hearing and said, I can give you the page numbers, but basically said, okay, I understand the special circumstances on your U.S. employment, so we're going to look at your Latvian employment as your prior employment for substantial gainful activity. So he actually said that at the hearing, but when he came to the decision, he flipped around on that. Well, that goes to the prior employment, but he also had a residual functional capacity testimony with regard to other jobs that were available in the economy. And the question is whether what he had done while he was here demonstrated an ability to do essentially sedentary work. He hadn't done any work since the date he filed. They found that there had been no substantial gainful activity since the filing date. His testimony previous to the filing date was that he had essentially two one-day jobs in which he, one, tried to act as a driver for somebody, and the other job was basically reviewing records as a private investigator. What year did he come to this country? This was after he came to the U.S. and after he moved to San Diego. What year did he come to this country? He came originally in 2003. Okay, so his resume shows that he worked between 2005 and 2008. And the job that he held in New Jersey was one in which they gave him special conditions that were not generally available in the economy. They actually allowed him to take two-hour breaks and to take time off because of the pain. There's two different jobs, right, in New Jersey? Yes, but the second one didn't last long. I'm just trying to get back to Judge Berzon's question. It seems to me that there's certainly the answer would have been yes. He had worked full-time for some period of time, a couple of years, in this country, isn't it? Isn't that the answer to the question? The answer to the question is he had worked, but under special conditions which are not generally available in the economy. Okay. The shooting was in what year? 1999. And so subsequent to the shooting, he had worked prior to coming to the U.S. and then, as you said, some subsequent to that. He was put on disability in Latvia. So he was given some desk duty while he was in rehab, but that would be customary with any injured peace officer. And so they followed the same procedures we do here. He was placed on disability, he received a disability pension. And he was put on light duty. He also had armed security 24 hours a day. Right. So he got accommodations both in Latvia as well as in subsequent jobs post-entry into the United States, right? So is that right? Yes. Well, yes. So your theory is that at some point, the bullet fragments must have migrated such that he's now unable to do what he previously had the ability to do? Yes, but that's since 1999. He applies in 2008. So our new evidence is relating to where the bullets are as of the date he filed, not as of 99. And the bullets will migrate. You know, his condition is not going to get better, it will only get worse. But we're saying that as of 2008, the medical evidence shows that that's where the bullets were and he was disabled at that time. Where in the record does it tell us his condition will only get worse? That is in Dr. Pavar's initial report coming out of Latvia. There were two. Dr. Dvorkan, I believe, also makes the same statement in 2010. Sorry, the second doctor is who? Which one? I believe Dvorkan, D-I-V-A-R-K-A-N, in 2010. And they're saying that you have to be careful. That was one of his concerns about physical movement because we can't remove them. If they migrate, your condition gets worse. And given the nature of the injury, they probably will migrate. On page 0-0-1-4-5-3 of the record, there's the report of Dr. – I guess it's the recent report. And it says radiology report. It appears that the bullet has migrated from its prior location. The assumption on the migration can be made by comparing the report of Dr. Glass from 2014 to the report of Dr. Dvorkan of 2010. It's unclear when and how the bullet might have specifically migrated downward. So I read that as saying that it migrated downward after 2010, no? I don't, but I also say if there's a remand for a new hearing, we're going to have the medical experts as witnesses and he will have an attorney for a change to go through this and we will ask him and establish whether in fact that was a 2008 or a 2010. But this seems specifically to say that, that it migrated downward after 2010. That's certainly the way I would record it. Yes. So it doesn't support the notion. What? Well, yes, it does say that. And I believe that it very possibly migrated downward before 2008 as well. The problem that I have with your argument today is that you're saying that if we remand, I'm going to have the opportunity to do this and he'll be helped. So you're saying on this record, there'll be further explanation as to the significance of it. But don't we have to look at the material or the new evidence that's proffered to determine whether it's material or not? Yes, but we're saying the new evidence. We can't unfortunately speculate as to whether a doctor could shore up or explain this in a way that's not already explained in the briefing. Actually, the standard on materiality is whether the evidence might or has a reasonable chance to change the outcome. It's not whether, as we sit here today, it's outcome determinative. But in a reasonable probability, well, actually possibility, I believe, to change the outcome in a new hearing. A reasonable possibility it would change the outcome. Right. So how do we get there? And I'm saying that this is the first comprehensive statement as to what his functional capacity was. Nothing came in earlier. It shows that of all the listed impairments, he is impaired. And that if it comes into evidence and is properly examined by the ALJ, it could very well change his opinion from the fact that he was not disabled to disability and entitled to benefits. Counsel, there's an application form. It's at 620 in the excerpt of record. And maybe you'll remember if I tell you that it's got, it's typed, but it's in very scripty kind of font. Do you remember? Yes. All right. Was that filled out by your client? Yes. Okay. Anything that is handwritten or scripty or with tiny little print is filled out by my client. Okay. Thank you. Anything further? No. We can come back. We've gone over our time here. Thank you. Good morning, Your Honors. May it please the Court. I'm Jeffrey Chen, appearing on behalf of Acting Commissioner Carolyn W. Colvin. In response to the panel's questions, I just wanted to start with a couple of important factual clarifications. This argument by the appellant that he had serious language deficits, it's not only unsupported, it's entirely contrary to significant amounts of evidence which I will go through. On a disability report, the claimant indicated that he could speak and understand English, that he could read and understand English, and he did not indicate an alternate preferred language. In his resume, he indicated he was trilingual in Latvian, English, and Russian with both verbal and written communicating skills sufficient to translate documents between them. And this is on excerpts of record 267. So the idea that he had a dictionary in his lap in order to facilitate his English proficiency is simply unfounded. Counsel, forgive me for interrupting, but could you back up and perhaps address the very first argument that opposing counsel made about that this is his one-time ... I mean, he is different than other Social Security applicants because he's an asylee, right? And so my understanding is that there's a seven-year window for him to apply, but can you fill me in on whether or not he's in a position where he'd be able to go back and reapply? Well, I'm not — I did not research that specific question on whether the special status of asylum would prevent him from reapplying, let's say, if he was ... Well, it matters a lot because there's a question about whether there was an abuse of discretion to not consider this new evidence. And so that's why I really need to know whether or not he's foreclosed from going back to reapply. I think it's pretty clear he could only get benefits for a seven-year period, but ... I'm not certain on that specific question, Your Honor, but to address the underlying question, the reason it's not material in this case, the new evidence, was several reasons. One, all the evidence postdated the ALJ's decision. So the question isn't that whether he would be able to apply or not. It's whether a claimant met his burden to show disability. Well, the question isn't whether the evidence misstate. If evidence is otherwise admissible, which I want to ask you, or otherwise we can remand now, then there are many cases in which, from a later period, the evidence was created at a later period, but it relates to the earlier period, right? Yes, Your Honor. So that's not preclusive. And although everything that the recent doctor said was pretty much in the present tense, his last statement is it goes back to 1999. Yes, Your Honor. The problem here is that that statement is entirely unsupported by the evidence in its entirety. First, Dr. Ralph did not see a claimant for the first time until after the ALJ's decision, and yet he opined that the individual was disabled going back to September 23, 1999, the date of his original injury. Now, I'd like to point out the claimant's counsel has argued that the deterioration is inevitable and that dating all the way back to 1999, but this is simply not true. In October 1999, Dr. Perez stated that, considering claimant had no limitations of motion and subsiding pain, felt that the bullets can be left in without increased discomfort. And this is on excerpts of record 1342. Well, Dr. Ralph opined that he's been completely disabled, I think, since 1999, but the record is pretty clear he's worked several years since then. Yes, Your Honor. In fact, the claimant earned between $38,000 and $45,000 annually from 2005 to 2007 in a variety of security, guard, and loss prevention positions. Furthermore, there was a lot of issues about whether or not there was imaging and other scans that were not available. It's simply not true. The evidence was replete with different scans, both going to the claimant's functional limitations but also the location and position of the bullet fragments. Were there earlier CAT scans? There was a CT scan done on May 2006 showing unremarkable disc spaces, normal nerve root, no spinal canal stenosis, and no cord abnormalities. And this is on 1345. So, from that, I guess you're answering my first question, which is, were there earlier CT scans? But opposing counsel says the condition has basically worsened. Assuming for the sake of argument that the later shown evidence showed it has worsened, it would not have been disabled until after the ALJ's final decision. In other words, it wouldn't relate to his condition as it existed at the time of the hearing? Precisely, Your Honor. And this is where I want to point out that claimant's counsel repeatedly states that Dr. Ralph is the only individual who has considered the residual function capacity. And that is simply not true. We have opinions from treating physicians, Dr. Prieto, saying that claimant essentially needed to sit and stand every one and a half hours because the pain would be exacerbated by being in one position for too long, an opinion that the ALJ gave considerable weight. A consultant referred to by treating physician Prieto, Dr. Macho, found that despite claimant's abdominal complaints of pain, that he had no hernia, no hepatitis, and recommended simply an exercise program to build abdominal strength. Dr. Sandra Eriks, the constitutive examiner, June 2010, only found moderate superficial tenderness, no straight leg raising. Well, the ALJ essentially disagreed with her, right? She said he had no limitations. Well, the ALJ did, you know, his job in this point, which is to consider the entire evidence and, you know, credited, you know, claimant's testimony despite the fact that But the answer to Judge Berzon's question is yes, right? The ALJ disagreed with her. Yes, Your Honor, in a way that's more favorable to a claimant. In fact, given all these physicians, the ALJ assessed a much more limiting residual functional capacity. I have a question regarding the credibility determination, which we haven't really talked about, but which was in some ways the core of the actual brief other than the new evidence. And the credibility determination relied on Dr. Eriks saying that he had no trouble getting dressed. But that isn't really what she said. What she said is he had no trouble putting on his shirt and tie and jacket. Presumably if somebody had a problem with the spine, the problem wouldn't be putting on the shirt and tie and jacket, it would be putting on his pants, right, which she didn't see. Your Honor, to address that specifically, the claimant told Dr. Eriks he was unable to dress himself or undress himself. But this is directly contradicted by the fact that he dressed himself quite quickly after examination. Dr. Eriks But he didn't do that. If you read it more carefully, what she said was he put on his shirt and tie and jacket. Well, yes, Your Honor, but the ALJ found that inconsistent with the statement that he is unable to dress himself. I mean, these are acts of dressing oneself. I think that the ALJ reasonably found that inconsistent, Your Honor. And if you want to talk about credibility That's very reasonable to me. I don't know what it goes to, but it does, it's, I don't know how much the, the, the credibility determination mattered, but it does seem to me to be an exaggeration of what she saw. Well, Your Honor, with respect, I can respect your disagreement on this. The ALJ actually gave three other reasons for the adverse credibility finding and did not solely rely on the exaggeration at Dr. Eriks. You know, the, the ALJ pointed specific to the objective evidence failing to support a claimant's allegation disability, the history of conservative treatment and the range of claimant's daily activities, which I could get into in greater detail if Your Honor wishes me to. But the exaggerated statements, I think the ALJ drew a reasonable inference. Reasonable judges may disagree with that, but this panel in the district court rightly deferred to the ALJ's factual findings. And I have the same legal question I asked your opponent in terms of whether 405G actually, it's your judicial review section, actually allows the admission of new evidence for the first time on appeal. What is your position about that? Our position is that sentence six just simply requires, I don't think there's a specific, sentence six doesn't go to the timing of this new evidence, but just requires that it be material, which means it must bear directly and substantially on the matter in dispute. And it is the government's position that this new evidence from Dr. Ralph, having occurred entirely after the ALJ's decision, having been contradicted by claimant's own work history, and frankly, by having findings, making findings that are contrary to earlier imaging and examination findings right around the time of the ALJ's decision, is simply not directly and substantially bear on the question of whether claimant was disabled as of November 10th, 2011, which is the cutoff point. The ALJ made no finding, and there's no preclusive effect of any date after that date. So we're simply talking about the evidence as of November 10th, 2011. And in this case, the CT scans, there were also radiology scans in June 2010, there was an examination by Dr. Eriks, there was the opinion from Dr. Prieto and Dr. Macho, the state agency physician opinions from Dr. Wall and Dr. Naiman, all on 2010-2011, which is highly probative and entirely proximate to the ALJ's decision, and simply rebuts claimant's argument that nobody had considered a residual functional capacity of the individual until Dr. Ralph. It's simply not true. Are you aware of any case in which, I actually do not read that provision that way, the only court that's referred to in 405G is the district court. And I, it's just so irregular in terms of the way district courts and appellate courts usually relate to each other. Are you aware of any instance in which information was admitted for the first time in the court of appeals, even for the purpose of remanding? I'm not personally aware of any instance. I think I would defer to the, we do discuss the inappropriateness of attaching this new evidence in our brief, and I think I would defer to our written statement. So I'm not aware of any specific instance where an appellate court has admitted new evidence, Your Honor, if that's your question. Or even, even allowed, even looked at it sufficiently to decide whether it was material, and it's just not the way courts usually operate. Yes, Your Honor. And I would also point out from a chronology standpoint that the reporting recommendation was issued on July 25th, 2014, and at this point, that had already covered the period of the new evidence. The first. But that's a whole different question. Suppose you had really good evidence now, for the first time, that did pertain to the regular period. I'm still wondering as a matter of the way, of the relationship between district courts and appellate courts, if they didn't introduce it in the district court, does he get to introduce it now? I'm not aware of any instance. You seem to be retreating to a different issue. I'm asking a legal question. Right. And I'm trying to answer, Your Honor. I'm not aware of any instance where the court has, you know, stated or allowed such an admission in, for the first time, before the Court of Appeals. If this panel has any other questions, I can go ahead and briefly sum up, or otherwise. Why don't you go ahead and sum up? Sure. In this case, I think, what is important to remember here is that it's not a question of, that claimant had this injury. I mean, we know that there's the bullets inside from an old injury from 1999. The question is what the functional limitations caused by those bullets. We have evidence from five physicians, as well as objective imaging scans, within two years of the ALJs in 2010 and 2011, showing that claimant could still perform work activity, and that the ALJ actually assessed a more favorable residual function capacity to the claimant that is more limiting than even the physicians found. And for that reason, I respectfully urge this Court to affirm the district court's decision in finding that the commissioner's decision to deny benefits was supported by substantial evidence. Thank you. Thank you. Thank you. Going back to Judge Berzon's original point on the subject of the amendment, the cases that we have found so far indicate that there's broad latitude as to grant an amendment if you meet the standards under the statute of materiality and unavailability at the time of the hearing. What I would add on top of that is, in general, in SSI disability cases, there is a very liberal policy in favor of getting it right, which makes for a liberal policy for remand, a liberal policy for amendment. And this comes in in the Ninth Circuit's credit as true doctrine, to the extent that if new evidence shows that benefits should have been awarded, they will be credited as true and awarded without a further evidentiary hearing. That's not true where there is a question as to the new evidence and what its effect would be in a hearing, and we cite to one of those cases. But in fact, the policy itself is a liberal policy to allow the record to be reexamined and corrected. I would be happy to submit a post-hearing, you know, letter brief on the subject of if any appellate court had actually done it in the first instance. It is our position that the court has the power to do so. Whether in fact they have done it, frankly, usually counsel comes into a case like this before the district court has shut the door. So we're in a... Counsel, I just have one other question, if I might, going back to the point that's bothering me. He can, if he obtains citizenship or works 40 qualifying quarters, he can reapply, right? If he has 40 qualifying quarters, yes, he can reapply. He is actually a citizen, but he doesn't have the necessarily employment, became a citizen this summer. Okay. So what's the best support you've got for the statement you opened with at the top of the hour that he has one shot to apply for these benefits? Because as an application under political asylum, there is a window for your first seven years. You're allowed to make a one-time application for benefits. That's not what it says. That's as I understood. He can apply again now, right? He can apply again now because he's attained citizenship and or when he works 40 qualifying quarters under 8 U.S.C. section 1612 A to B. Does that sound right? The 40 quarters, yes. The citizenship, I checked with him yesterday, he said he is still not eligible. Okay. What's your strongest support? I don't want to belabor the point, but what's your strongest support for the notion that this is a one-time only deal for him and he cannot reapply? Because as we briefed and stated the statutes in the opening run, where he is a political asylee, you are an exception to the ordinary, you can't apply for anything. I'm citing the political asylee provision. So and I recognize that there's a seven-year duration, durational limit, but I'm asking a different question and maybe you've answered it to the best of your ability and I'll go back and double-check. But my question is whether he can reapply, not whether he could qualify for a longer duration of benefits. My understanding is he could not reapply. Thank you. I would be delighted if he could. Can I follow up on that because now your answer has really confused me. You had started your argument relying on the exemption for asylees, which has the seven-year limitation. But in response to my colleague's question just now, you said that he has been granted citizenship, right? So what's missing is the qualifying quarters of work. Correct. He was not a citizen at the time we filed, by the way. Right. But now he is a U.S. citizen? Within the last two months, yes. So assuming that he gets the proper quarters of work, he can reapply, correct? But he doesn't have any proper quarters and he is not eligible for them because they get food stamps. So even though his wife has been working part-time, she gets no Social Security credits because they're food stamp recipients. So they will never reach the 10 years of employment. Right. But it's because of that fact and not any disqualification from his status as an asylee, correct? Well, he was disqualified at the time he filed. This thing has been going on an immense amount of years. So understand, his status as an asylee in Germany. Well, I mean, that's one way of looking at it. And the other way of looking at it is that he got special dispensation to not have to have the 10 years because he was an asylee. I agree. I'm just saying that... But is he in fact a citizen now? He said yes. He took the oath over the summer. So he is in fact a citizen now. Okay. You substantially over your time. Yes. If there's nothing further, thank you for your argument. Thank you very much. The last case on the calendar is 14-567.
judges: Berzon, Christen, Nguyen